```
____ FILED      ____ LODGED
____ RECEIVED   ____ COPY

     AUG 1 1 2015

  CLERK U S DISTRICT COURT
    DISTRICT OF ARIZONA
BY_____ DEPUTY
```

SEALED

1
2
3
4
5

6           IN THE UNITED STATES DISTRICT COURT

7              FOR THE DISTRICT OF ARIZONA

| United States of America, | CR-15-986-PHX-DGC (JZB) |
|---|---|
| Plaintiff, | **INDICTMENT** |
| vs. | VIO: 18 U.S.C. § 1343 (Wire Fraud) (Counts 1-24) |
| Murray John Lawson, | 18 U.S.C. § 1028(A) (Aggravated Identity Theft) (Counts 25-26) |
| Defendant. | 18 U.S.C. § 1957(a) (Transactional Money Laundering) (Counts 27-30) |
| | 18 U.S.C. § 982 and 28 U.S.C. § 2461(c) (Forfeiture Allegations) |

THE GRAND JURY CHARGES:

At all times material to this indictment:

## DEFENDANT

1.     MURRAY JOHN LAWSON ("LAWSON"), age 64, is a Canadian citizen with United States residency.  He is a former chiropractor who currently resides in Sun City West, Arizona.

## INTRODUCTION
## AND SCHEME TO DEFRAUD

2.     Beginning sometime in 2008, and continuing through August 2012, LAWSON engaged in a scheme to defraud RF, the victim, by making materially false and fraudulent representations concerning the trading of foreign currencies made on behalf of RF, and

1    the profitability of those trades.  LAWSON obtained substantial funds from RF with the

2    false representations that: LAWSON would, and did, invest RF's monies by trading

3    foreign currencies; that LAWSON's foreign currency trading yielded significant profits

4    for RF; that LAWSON only charged a small management fee to RF; and that RF's

5    monies would be readily accessible to RF.  To further the scheme, LAWSON used fake

6    and real identities to communicate with RF through electronic mail.  Instead of investing

7    RF's monies as promised, LAWSON used nearly all of RF's monies to fund his own

8    personal lifestyle.

9                              **INITIAL SOLICIATIONS BY LAWSON**

10   3.      Sometime in 2008, LAWSON informed RF that he closed his chiropractor clinic

11   in order to trade foreign currencies full time at a Swiss foreign currency exchange bank

12   called Dukascopy Bank, in Geneva, Switzerland.  LAWSON alleged he was trading

13   foreign currency almost every day and that he was able to produce annual returns

14   between 30 and 40 percent based on a system he had created.  LAWSON alleged that he

15   traded foreign currency on behalf of 10 individuals and that each person had an account

16   at Dukascopy Bank.  LAWSON further alleged that he had control over the individual

17   accounts and that these individuals were either friends or members of his family.

18   4.      LAWSON informed RF that he worked with James Prestwick ("Prestwick") to

19   send money from the United States through either the Cook Islands or Belize into the

20   Dukascopy accounts.  LAWSON alleged that Prestwick was an attorney, a former CIA

21   case officer, and a certified public accountant that lived somewhere in the mid-western

22   United States.

23   5.      Prestwick is a fictitious person that LAWSON created to further the scheme to

24   defraud RF.  LAWSON would communicate with RF, as Prestwick, from the email

25   account, james_prestwick@yahoo.com.

26   6.      LAWSON first opened a personal trading account (ending in 2956) at Dukascopy

27   Bank in November of 2009 with a $9,000 deposit.  Account number 2956 was the only

28   account LAWSON opened at Dukascopy Bank.

### RF'S INITIAL $10,000 INVESTMENT WITH LAWSON

7.     Based on LAWSON's false representations about the profits he was generating for investors, RF invested $10,000 with LAWSON in December 2009.

8.     After receiving RF's money, LAWSON falsely informed RF that: an account had been established at Dukascopy Bank for RF; RF's money had been transmitted to the Dukascopy Bank account; and LAWSON was using RF's money to trade foreign currency.

9.     On December 11, 2009, RF received an email from Prestwick with an attached transaction spreadsheet.  The spreadsheet falsely reflected that RF had a Dukascopy trading account (ending in 5185) and that the balance was $10,000.

10.    On January 6, 2010, RF received an email from Prestwick with an attached transaction spreadsheet.  The spreadsheet falsely reflected RF's account to have a credit of $186.91 and a balance of $10,186.

11.    On March 1, 2010, RF received an email from Prestwick which stated, "*In summary... we continue to make good profits and returns.*"  The email included a transaction spreadsheet which falsely reflected RF's account to have a credit of $170.39 as a result of January trades, a credit of $166.14 as a result of February trades, and a balance of $10,521.

12.    In reality, no account was created for RF at Dukascopy Bank, and LAWSON did not transfer RF's $10,000.

### RF'S $40,000 INVESTMENT WITH LAWSON

13.    Based on the alleged returns of the initial investment, RF invested an additional $40,000 with LAWSON on June 14, 2010.  LAWSON falsely informed RF that he had transferred the $40,000 to RF's account at Dukascopy Bank.

14.    On July 9, 2010, LAWSON deposited $7,600 into his personal Arizona State Credit Union ("ASCU") bank account (ending in 0178).  Prior to this deposit, LAWSON's ASCU account (0178) only had a balance of $13.95.  On July 13, 2010, LAWSON transferred $7,000 from his ASCU account (0178) to his personal Dukascopy

account (2956).

15.    On July 26, 2010, LAWSON deposited $9,000 into his ASCU account (0178). On the same day, LAWSON transferred $7,000 from his ACSU account (0178) to his personal Dukascopy account (2956).

16.    On July 27, 2010, LAWSON deposited $2,000 into his ASCU account (0178), bringing the account balance to $4,143.

17.    Between July 27, 2010 and August 12, 2010, LAWSON spent a majority of the money he had deposited into his ASCU account (0178) for personal use. He spent $1,470 at the Marriott Hotel in Del Ray Beach, Florida, $360 at TPC Sawgrass Golf Club (a Florida based PGA Tour golf course), several hundred dollars at Florida based restaurants, almost a hundred dollars at gas stations, $58 at Linda Bean's Perfumes, and almost $50 at Starbucks.

18.    On August 12, 2010, LAWSON wired $5,000 from his Dukascopy account (2956) to his ASCU account (0178). This left the Dukascopy account balance at $15,740.

19.    On or about August 31, 2010, RF received an email from Prestwick with a transaction spreadsheet. The spreadsheet falsely reflected RF's account balance to be $53,252.

20.    By September 17, 2010, the combined balance of LAWSON's ASCU accounts (0178 and 0755) was approximately $1,400.

21.    On September 17, 2010, LAWSON informed RF, via email, that he was changing trading platforms and that the account minimums will be higher.

22.    Between September 21 to October 5, 2010, LAWSON sent a series of emails to RF suggesting that the stock market is going to collapse, and that investors should sell their stocks and liquidate their 401Ks and retirement accounts. LAWSON also suggested that trading in the foreign currency market was always profitable.

23.    On September 21 and 23 of 2010, LAWSON transferred $3,000 and $2,000, respectively, from his Dukascopy account (2956) to his ASCU account (0178). The wire transfers left a balance of $10,218 in LAWSON's Dukascopy account.

24.    On October 5, 2010, RF received an email from Prestwick with an attached transaction spreadsheet.  The spreadsheet falsely reflected RF's account to be at $54,130. The Prestwick email also falsely alleged, "*in Sept, 20 trades were taken, we had 14 WINNERS and 5 stopped Out (Losers) with 1 carried into Oct.*"

25.    On November 24, 2010, LAWSON transferred $4,000 from his Dukascopy account (2956) to his ASCU account (0178).

26.    On December 1, 2010, RF received a Prestwick email with an attached transaction spreadsheet.  The spreadsheet falsely reflected RF's account to have $108,760. The Preswick email also falsely alleged that LAWSON had closed 21 trades in November, with 16 winning trades and five losing trades.

## RF INVESTS AN ADDITIONAL $25,000 WITH LAWSON

27.    Based on the alleged performance of the Dukascopy trading account, RF invested an additional $25,000 with LAWSON on December 7, 2010.

28.    On the same day, LAWSON deposited $6,100 into his ASCU account (0178). LAWSON's account balance was only $68 before this transfer.  After the deposit, LAWSON began using the money for his own personal use.

29.    Between December 21, 2010, and January 27, 2011, LAWSON made three additional deposits into his ASCU account (0178).  The aggregate of these three deposits was $12,800.

30.    On January 28, 2011, LAWSON wired $5,000 from his ASCU account (0178) to his Dukascopy account (2956).  By January 2011, LAWSON's Dukascopy account had only $3,673.

31.    On February 4, 2011, RF received an email from Prestwick.  The email falsely claimed that RF's account appreciated $3,593 in the month of January and that RF's account had $113,582.

## RF INVESTS AN ADDITIONAL $480,000 WITH LAWSON

32.    Between March 2011 and June 2011, RF invested approximately $480,000 with LAWSON.  RF made this investment based on the alleged performance of the Dukascopy

- 5 -

account, and on LAWSON's assurance that RF would be able to obtain a return of the funds within a week if requested.

33.     RF provided approximately $480,000 to LAWSON ($275,000 Cashier's Check and $205,000 Cash). LAWSON deposited approximately $272,000 into his personal ASCU accounts (0178 and 0755). The aggregate balance of LAWSON's ASCU bank accounts was approximately $3,800 before the deposit of RF's funds.

34.     On April 7, 2011, LAWSON transferred $45,000 from his ASCU account (0178) to his account at Heritage International Bank and Trust in Belize.

35.     On May 5, 2011, LAWSON purchased a $47,000 Infiniti automobile for himself.

36.     Around June 2011, LAWSON falsely informed RF that he transferred the funds to RF's Dukascopy account.

37.     On June 30, 2011, RF received an email from Prestwick which falsely stated that $481,386 was deposited into his Dukascopy account (5185).

38.     On September 28, 2011, LAWSON purchased a $19,000 Volkswagon automobile for his spouse.

39.     On October 26, 2011, LAWSON transferred an additional $26,875 from his ASCU account (0178) to his account at Heritage International Bank and Trust in Belize. For this wire transfer, LAWSON stated that the monies were for a down payment on vacation property.

40.     Between December 2009 and January 2013, LAWSON also spent:

- Over $60,000 for rent payments;
- Over $38,000 for travel;
- Over $37,000 for food and entertainment;
- Over $26,000 for purchases from Cost Co and Walmart;
- Over $23,000 in monetary gifts to other family members;
- Approximately $20,000 for utilities;
- Over $13,000 for phone and electronics payments;
- Over $12,000 for golf;

- Over $11,000 for automobile repairs;
- Almost $6,000 for Starbucks Coffee;
- Over $5,000 for purchases from QVC and the Home Shopping Network; and
- Over $2,000 on dating websites.

**LAWSON DOES NOT RETURN RF'S MONEY**

41.    In January of 2012, LAWSON was asked to return RF's investment. By this time, LAWSON had misappropriated the majority of RF's investment and he could not return the money.

42.    On January 10, 2012, RF received an email from Prestwick with an attached transaction spreadsheet.  The spreadsheet falsely reflected RF's account balance to be $713,838.06 on December 31, 2011.  In reality, LAWSON's Dukascopy account had a balance of $46,557.  The combined balance of LAWSON's ASCU accounts was only $741.

43.    Starting in February 2012, LAWSON, through the Prestwick emails, began suggesting to RF she needed to create multiple bank accounts, including an account offshore, to obtain the investment funds allegedly at RF's account at Dukascopy Bank.

44.    By mid-February, 2012, LAWSON's ASCU account (0178) had been closed with a $0 balance.  LAWSON's ASCU account (0755) only had around $800. LAWSON's Dukascopy account (2956) only had around $37,000.

45.    On February 13, 2012, RF received an email from Prestwick which alleged that bank rules prohibited the expeditious return of RF's monies.

46.    On February 14, 2012, LAWSON informed RF, via email, that he will not be able to withdraw RF's funds by the end of February.

47.    On February 21, 2012, RF received an email from Prestwick which suggested that RF open an offshore bank account to assist in the withdrawal process, and suggested that RF was listed on the Federal government's watch list for RF's banking activities.

48.    By March of 2012, RF opened a foreign bank account at Capital Conservators, per

1  LAWSON's instruction, in order to receive funds from LAWSON's account at Capital
2  Security Bank.  LAWSON transferred $1,500 to RF, and informed RF that $1,500 was
3  the maximum amount he could move that month due to banking restrictions.

4  49.    On or about March 15, 2012, LAWSON provided RF with an email that he
5  altered.    The email was purportedly written by JU, a real person, from Capital
6  Conservators.  The email falsely claimed that RF's requested wire transfer was denied
7  because it exceeded the deposit restriction for March, and that RF's account had been
8  frozen pending a review by JU's legal department.

9  50.    On or about March 15, 2012, LAWSON provided RF with another email that he
10  altered.  The email was purportedly written by RZ, a real person, from Dukascopy Bank.
11  The email falsely claimed that Dukascopy could not send funds to RF's account at
12  Capital Conservators.

13  51.    On March 20, 2012, RF received a Prestwick email with an account statement.
14  The account statement falsely reflected RF's account balance to be $685,000.

15  52.    For the next several months, LAWSON continued to falsely inform RF that he and
16  Prestwick were working on securing the return of RF's investment.

17  53.    In June 2012, LAWSON falsely informed RF that: RF's funds were frozen by
18  Dukascopy's legal department; RF's actions had caused the bank to freeze the account;
19  and RF may be sued by his other clients.

20  54.    In June 2012, LAWSON's Dukascopy account (2956) was not frozen and had less
21  than $30,000.  LAWSON continued to use the Dukascopy Bank account until January
22  2013, when he withdrew the remaining $11,000 from the account.

23  55.    LAWSON never fully returned RF's monies and ceased communicating with RF
24  after August 27, 2012.

**WIRE FRAUD**
25
**COUNTS 1 – 24**
26
**(Title 18 U.S.C. § 1343)**

27  56.    The factual allegations in paragraphs 1 through 55 of the Indictment are
28  incorporated by reference and re-alleged as though set forth fully herein.

57.     Beginning at a time unknown to the Grand Jury, but at least as early as in or around September 2009 and continuing to a date unknown to the Grand Jury, but through at least in or around August 2012, in the District of Arizona and elsewhere, defendant LAWSON, did knowingly and willfully devise and intend to devise a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations and promises.

58.     On or about the dates listed below, each date constituting a separate count, in the District of Arizona and elsewhere, for the purpose of executing said scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, defendant LAWSON, did knowingly transmit electronic messages to RF by means of wire, radio, and television communications in interstate commerce, each such instance being a separate Count of this Indictment:

| COUNT | ON OR ABOUT DATE | EMAIL SENDER | EMAIL RECIPIENT | PURPOSE OF EMAIL |
|---|---|---|---|---|
| 1 | 9/3/2010 | James_Prestwick @yahoo.com | RF | Provides a False Account Record of a non-existent Dukascopy bank account |
| 2 | 9/21/2010 | drmjlfx@gmail. Com | RF | Alleges Collapse of Stock Market and Alleges Foreign Currency Trading will be profitable |
| 3 | 9/30/2010 | drmjlfx@gmail. Com | RF | Alleges collapse of stock market |
| 4 | 10/5/2010 | drmjlfx@gmail. Com | RF | Recommends liquidation of 401Ks and retirement accounts. |
| 5 | 10/5/2010 | James_Prestwick @yahoo.com | RF | Provides a False Account Record of a non-existent Dukascopy bank account |

| COUNT | ON OR ABOUT DATE | EMAIL SENDER | EMAIL RECIPIENT | PURPOSE OF EMAIL |
|-------|------------------|--------------|-----------------|------------------|
| 6 | 12/1/2010 | James_Prestwick @yahoo.com | RF | Provides a False Account Record of a non-existent Dukascopy bank account |
| 7 | 2/4/2011 | James_Prestwick @yahoo.com | RF | Provides a False Account Record of a non-existent Dukascopy bank account |
| 8 | 6/30/2011 | James_Prestwick @yahoo.com | RF | Provides a False Account Record of a non-existent Dukascopy bank account |
| 9 | 7/8/2011 | James_Prestwick @yahoo.com | RF | Provides a False Account Record of a non-existent Dukascopy bank account |
| 10 | 8/2/2011 | James_Prestwick @yahoo.com | RF | Provides a False Account Record of a non-existent Dukascopy bank account |
| 11 | 9/8/2011 | James_Prestwick @yahoo.com | RF | Provides a False Account Record of a non-existent Dukascopy bank account |
| 12 | 10/4/2011 | James_Prestwick @yahoo.com | RF | Provides a False Account Record of a non-existent Dukascopy bank account |
| 13 | 11/9/2011 | James_Prestwick @yahoo.com | RF | Provides a False Account Record of a non-existent Dukascopy bank account |
| 14 | 12/2/2011 | James_Prestwick @yahoo.com | RF | Provides a False Account Record of a non-existent Dukascopy bank account |
| 15 | 1/10/2012 | James_Prestwick @yahoo.com | RF | Provides a False Account Record of a non-existent Dukascopy bank account |
| 16 | 2/6/2012 | James_Prestwick @yahoo.com | RF | Provides a False Account Record of a non-existent Dukascopy bank account |
| 17 | 2/11/2012 | James_Prestwick @yahoo.com | RF | Falsely alleges RF needs to establish 3 foreign bank to obtain return of funds |

| COUNT | ON OR ABOUT DATE | EMAIL SENDER | EMAIL RECIPIENT | PURPOSE OF EMAIL |
|---|---|---|---|---|
| 18 | 3/15/2012 | drmjlfx@gmail.com | RF | Provides an altered email purportedly from J.U. of Capital Conservator Bank |
| 19 | 3/15/2012 | drmjlfx@gmail.com | RF | Provides an altered email purportedly from R.Z. of Dukascopy Bank |
| 20 | 3/20/2012 | James_Prestwick@yahoo.com | RF | Provides a False Account Record of a non-existent Dukascopy bank account |
| 21 | 4/4/2012 | James_Prestwick@yahoo.com | RF | Provides a False Account Record of a non-existent Dukascopy bank account |
| 22 | 5/14/2012 | drmjlfx@gmail.com | RF | Falsely alleges Dukascopy account frozen |
| 23 | 5/15/2012 | drmjlfx@gmail.com | RF | RF had 16% of her account in trades. |
| 24 | 6/4/2012 | drmjlfx@gmail.com | RF | Falsely alleges that all funds are frozen at Dukascopy and that a group of investors are going to file a lawsuit against RF |

All in violation of 18 U.S.C. § 1343.

## AGGRAVATED IDENTITY THEFT
## COUNTS 25 – 26
## (Title 18 U.S.C. § 1028(A))

59.    The factual allegations in paragraphs 1 through 55 of the Indictment are incorporated by reference and re-alleged as though set forth fully herein.

60.    On or about the dates specified below, in the District of Arizona and elsewhere, each instance being a separate count of this indictment, defendant LAWSON did knowingly transfer, possess, and use, without lawful authority, a means of identification

- 11 -

of another person during and in relation to a felony violation enumerated in Title 18 U.S.C. § 1028A(c), to wit: Wire Fraud in violation of Title 18 U.S.C. § 1343, knowing that the means of identification belonged to another actual person, in violation of Title 18 U.S.C. § 1028A(a)(1).

| COUNT | ON OR ABOUT DATE | MEANS OF IDENTIFICATOIN |
|-------|------------------|-------------------------|
| 25 | 3/15/2012 | LAWSON used JU's name in an email to RF. The email falsely claimed that RF's request for funds had been refused and that the account had been frozen. |
| 26 | 3/15/2012 | LAWSON used RZ's name in an email to RF. The email falsely claimed that Dukascopy Bank could not send funds to RF's account. |

All in violation of 18 U.S.C. § 1028(A).

## TRANSACTIONAL MONEY LAUNDERING
### COUNTS 27 – 30
### (Title 18 U.S.C. § 1957(a))

61.     The factual allegations in paragraphs 1 through 55 of the Indictment are incorporated by reference and re-alleged as though set forth fully herein.

62.     On or about the dates set forth below, in the District of Arizona and elsewhere, each such instance being a different count of this Indictment, defendant LAWSON knowingly engaged in monetary transactions in criminally-derived property of a value greater than $10,000, which was derived from specified unlawful activity, namely a violation of Title 18 U.S.C. § 1343 (Wire Fraud) as alleged in counts one through twenty-four.

| COUNT | ON OR ABOUT DATE OF TRANSACTION | DESCRIPTION OF TRANSACTION |
|-------|----------------------------------|-----------------------------|
| 27 | 4/7/2011 | With funds obtained from RF, LAWSON wired $45,000 to his Heritage Bank account. |

| 28 | 5/10/2011 | With funds obtained from the RF, LAWSON issued a $47,653.44 check to Infiniti on Camelback. |
| 29 | 9/28/2011 | With funds obtained from RF, LAWSON provided a $13,950 ASCU cashier's check (ending in 5905) to Larry Miller Volkswagen. |
| 30 | 10/25/2011 | With funds obtained from RF, LAWSON wired $26,875.16 to his Heritage Bank account. |

All in Violation of 18 U.S.C. § 1957(a).

## FORFEITURE ALLEGATIONS

63.     The factual allegations in paragraphs 1-55 and in Counts 1-24 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 982(a)(2)(A) and Title 28, United States Code, Section 2461(c).

64.     Upon conviction of the offenses in violation of Title 18, United States Code, Sections 1343, as set forth in Counts 1 through 24 of this Indictment, defendant LAWSON shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such violations, including, but not limited to: a money judgment in the amount of no less than $450,000.00.

65.     The factual allegations in paragraphs 1-55 and in Counts 27 through 30 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 982(a)(1).

66.     Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction of an offense in violation of Title 18, United States Code, Section 1957, defendant LAWSON shall forfeit to the United States of America any property, real or personal, involved in such offense, and any property traceable to such property.  The property to be forfeited includes, but is not limited to, the following: a money judgment in the amount of no less than $450,000.00.

67.     Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title

1   18, United States Code, Section 982(b) and Title 28, United States Code, Section 2461,

2   the defendant shall forfeit substitute property, up to the value of the forfeitable property,

3   or any portion thereof, if by any act or omission of the defendant, the forfeitable property

4   cannot be located upon the exercise of due diligence; has been transferred, sold to, or

5   deposited with a third party; has been placed beyond the jurisdiction of the court; has

6   been substantially diminished in value; or has been commingled with other property

7   which cannot be divided without difficulty.

8          All in accordance with Title 18, United States Code, Section 982; Title 28 United

9   States Code, Section 2461; and Rule 32.2(a), Federal Rules of Criminal Procedure.

A TRUE BILL

_S/_
FOREPERSON OF THE GRAND JURY
Date:  August 11, 2015

JOHN S. LEONARDO
United States Attorney
District of Arizona

_S/_
RAYMOND K. WOO
MARK S. KOKANOVICH
Assistant U.S. Attorneys